**QUITT v. STONE, Federal Prohibition Administrator, et al.**
No. 1650.

District Court, D. Maryland.
March 7, 1930.

Richard B. Tippett and Derby A. Lynch, both of Baltimore, Md., for complainant.

A. W. W. Woodcock, U. S. Atty., and William C. Purnell, Asst. U. S. Atty., both of Baltimore, Md. (Will H. Krause, of Washington, D. C., of counsel), for defendants.

COLEMAN, District Judge.

This is a proceeding to review the action of the local prohibition administrator at Baltimore in refusing to renew a permit for specially denatured alcohol.

On July 17, 1929, the complainant, Dr. William Quitt, a dentist, trading as the Three Flowers Chemical Company, with place of business in the city of Baltimore, applied to the local prohibition administrator for a renewal of his permit to withdraw, during the year 1930, 5,550 gallons per month of specially denatured alcohol. In 1925, complainant was first granted a permit to withdraw 200 gallons per month. The permit was renewed from year to year, the amount allowed to be withdrawn being increased until, in 1927, it reached the amount sought for in the present controversy. These successive permits stated on their face that the withdrawals were for use in the manufacture of various specified toilet preparations or extracts, such manufacture to be according to formulas which were from time to time approved by the commissioner. The last permit, issued on January 28, 1929, contained the express provision that it was "issued subject to any

change in formulæ in preparations which the Bureau may require," and that "permittee will make further modification of his formulæ for Rose Extract set forth on the face hereof which the Bureau may require after due notice in the event it be found said preparation is used contrary to the law or regulations." On December 9, 1929, the local administrator notified complainant in writing, that submission of new and better quality of oil and new formulæ would have to be made before favorable action could be taken on his application for a permit for 1930. This the complainant refused to do, whereupon, on December 24, 1929, the local administrator advised the complainant in writing that his application was disapproved, giving as his reasons that complainant had not in good faith complied with the National Prohibition Act, with the regulations pursuant thereto, nor with the terms of his permit in that, as the administrator's investigations disclosed, there was no proof of legitimate need, use, or disposition of complainant's product as such; that he had disposed of it under circumstances from which any reasonable person might deduce its intended unlawful use, and that all of the purchasers of complainant's product had obstructed the government in its investigation of the ultimate uses and disposition thereof. The refusal notice also stated that a hearing would be afforded if desired. Thereupon, complainant filed a bill in this court praying that the action of the local administrator in refusing a permit for 1930, as aforesaid, was arbitrary and contrary to law, sought a review of his action, and asked that his findings be reversed, and the permit be granted. The local administrator defended his action in an answer to the bill, and on January 2, 1930, as a result of a hearing, this court decided that the National Prohibition Act (title 2, § 9, 41 Stat. 311, 27 US CA § 21) made a hearing before the commissioner or local administrator, a condition precedent to any action by this court, for otherwise there was no record of any proceedings which the court could review. Therefore, the case was remanded to the local administrator, stipulating that a hearing should be granted within fifteen days. Because of the fact that the local administrator, although he had originally offered to grant a hearing, failed to do so in full compliance with the terms of the law, namely, it was not until December 24th that he announced his decision and therefore the minimum fifteen days notice prior to a hearing could not be granted without overlapping into the year for which the permit was sought, the court further ruled

that, pending such hearing and decision thereon by the local administrator, complainant's permit for 1929 would be considered as still in effect. In passing such order, however, the court expressly stated that the same was not to be construed as a determination of the question as to whether the complainant's permit was, as he contended, a basic permit, and not terminated by lapse of time every twelve months, or whether, as the government contended, it was so terminated.

In accordance with the aforegoing order, the local administrator granted a hearing on January 14, 1930, presided over by a hearer in accordance with the law and the regulations, which consumed nine days, and at which a great amount of testimony was taken and lengthy arguments were made. On February 8th, the hearer rendered his findings confirming the findings and recommendations previously issued by his office, that complainant's permit should not be renewed, and summarized his reasons as follows: "first, that there is no legitimate demand for the product manufactured by the complainant and that the demand he has been supplying is not a legitimate demand; second, that the admitted facts in the case cannot be reconciled with good faith as it is contemplated in carrying out the provisions of the National Prohibition Act; third, that the information in the possession of the administrator on December 24th, 1929, was more than sufficient to justify the belief that this product was being diverted to beverage use; fourth, that the permit operation of the complainant is not one that is contemplated by the law and regulations, but is directly contrary to the true intent of the statute, in that the product is not manufactured and prepared for the market as required by section 4, title 2 of the National Prohibition Act and the regulations promulgated thereunder." These findings and recommendations were approved by the local administrator. Complainant thereupon renewed his application for a review of the local administrator's action by bill of complaint similar to the one originally filed, and it was upon this bill and the government's answer thereto that the present hearing was had.

█ At the beginning, it is necessary to point out that in a proceeding of this kind this court is controlled by two fundamental principles: (1) that no one has a vested right to purchase and use liquor even for lawful purposes, and correspondingly, no one has a vested right to obtain a permit therefor on his mere demand, the dominant purpose of the act being to prevent the use of intoxi-

cating liquor as a beverage, and by its express declaration all of its provisions are to be liberally construed to this end; (2) that the discretion of the local administrator ·is final and conclusive, and not subject to judicial review, unless his decision is wholly unsupported by the evidence, or is wholly dependent· upon a question of law, or is arbitrary or capricious; and therefore the court, in reviewing the commissioner's action, is not granting a hearing de novo or even a hearing supplemental .to the commissioner's action. Ma-King Products Co. v. Blair, 271 U. S. 479, 46 S. Ct. 544, 70 L. Ed. 1046; Yudelson v. Andrews (C. C. A.) 25 F.(2d) 80; Herbert v. Anstine (C. C. A. 4th Circuit) 37 F. (2d) 552.

The government took the position that complainant was in the same situation as would be a new applicant for a permit, which position the hearer held to be correct, and therefore overruled a motion made by complainant, that complainant's prior permit constituted a vested right in him which could not be taken away except by citation and proof of a violation of some provision of the National Prohibition Act or regulation promulgated pursuant thereto; in short, that the burden of proof was upon the government in the first instance, just as it would be in a case where the government seeks to revoke a permit.

■ As a preliminary matter, it is necessary to decide whether this action of the hearer, that is, of the local administrator, was correct in treating the complainant's permit as valid merely for one year and, therefore, as having been terminated by lapse of time. The authorities are not in accord on this question. In fact, they may be said to be rather evenly divided. However, the court feels that the reasoning is more logical in those decisions which maintain, as did the local administrator, that the provisions of section 6, title 2 of the Act (27 USCA § 16), were intended to embrace permits of this kind and the court particularly adopts the reasoning, to this effect, contained in the decision of the Circuit Court of Appeals for the Seventh Circuit in Chicago Grain Products, Inc., v. Mellon, 14 F.(2d) 362. In fact, this court feels that this question is impliedly, if not expressly, set at rest by its own decision in the case of Hawthorne v. United States, recently affirmed by the Circuit Court of Appeals, 37 F.(2d) 316; see, also, Cywan v. Blair (D. C.) 16 F.(2d) 279; Lion Laboratories v. Campbell (C. C. A.) 34 F.(2d) 642.

We come, then, to the fundamental question involved in the present controversy, namely, has the local administrator abused the discretion vested in him, that is to say, is his decision wholly unsupported by the evidence? In other words, is it arbitrary or capricious? The court concludes that this question must be answered in the negative, and in so doing it deems it unnecessary to analyze the great amount of testimony that was produced before the hearer, or in fact to consider any but the fourth, or last ground upon which the hearer based his findings, namely, that the permit operation of the complainant is not one that is· contemplated by the law and the regulations, because ample warrant for basing his action on this ground alone is to be found in one circumstance which is the key to the entire case. The court refers to the fact that the permit which complainant now seeks to obtain, whether it be considered as a renewal of the former permit, as we think it must, or whether the proceedings are to be construed as in the nature of revocation proceedings, is expressly restricted to withdrawals of specially denatured alcohol *to be used on the complainant's specified premises in Baltimore "for manufacturing purposes,"* and specifically recites the various toilet water and hair tonic preparations that are to be manufactured. Not only is it uncontradicted that the complainant does not intend himself to manufacture and place upon the market any of these products as such, but it is an equally undisputed fact that his entire output, namely 70,000 gallons annually, is sold to some three or four customers admittedly not to be marketed by them as these various toilet water or hair tonic preparations, none of which is now to be found on the market as such, but to be used as a base for the manufacture· of other preparations. In turn, these middlemen themselves employ others to do such other manufacturing, and in this manner they enable the chain to be indefinitely extended, until it is entirely possible, if not indeed probable, that the tracing of the actual ultimate disposition of the denatured alcohol, in whatever form, becomes incapable of accomplishment.

The basis of complainant's argument may be said to be twofold: first, that there is a total absence of proof of any bad faith, express or implied, on the part of complainant at any time since he first became a permittee; and second, that the present action of the local administrator is arbitrary and totally unjustified in the light of the action of his superior officer, namely, Commissioner Doran himself, who, after being appealed to on repeated occasions, overruled the action of the local administrator, and held that the com-

plainant's then position was justified. In support of this latter contention, complainant stresses the fact that commencing in June, 1928, three citations were issued against him by the local administrator, containing in all forty-two distinct charges of violation of the law or regulations issued pursuant thereto, but that in every case the citations were dismissed, and he was allowed to proceed with the manufacture and marketing of his products.

 This position taken by the complainant discloses a failure to recognize the full scope of the very broad discretionary powers vested by the express language of the Prohibition Act itself in the commissioner and in his subordinates, and apparently an equal failure to understand the true ground on which the local administrator attempts to justify his action. Section 13, title 3 of the National Prohibition Act (27 USCA § 83) provides as follows: "The commissioner shall from time to time issue regulations respecting the establishment, bonding, and operation of industrial-alcohol plants, denaturing plants, and bonded warehouses authorized herein, and the distribution, sale, export, and use of alcohol which may be necessary, advisable, or proper, to secure the revenue, to prevent diversion of the alcohol to illegal uses, and to place the nonbeverage alcohol industry and other industries using such alcohol as a chemical raw material or for other lawful purpose upon the highest possible plane of scientific and commercial efficiency consistent with the interests of the Government, and which shall insure an ample supply of such alcohol and promote its use in scientific research and the development of fuels, dyes, and other lawful products."

Note the mandatory requirement that the commissioner shall, by the issuance from time to time of regulations, "place the nonbeverage alcohol industry and other industries' using such alcohol as a chemical raw material or for other lawful purpose on the highest possible plane of scientific and commercial efficiency consistent with the interests of the Government," which "shall insure an ample supply of such alcohol and promote its use in scientific research and the development of fuels, dyes, and other lawful products." This language clearly indicates that the commissioner is clothed with such discretion as may be necessary to enable him to regulate, in every reasonable way, the use of the specially denatured alcohol involved in this proceeding. The language of the law does not contemplate that the commissioner shall disregard legitimate needs of the trade, which

means that he is not permitted to substitute his own views as to what the public should buy, for those which the public itself holds, albeit such views of the public may be wholly created or inspired by the seller of the particular article. On the other hand, it does contemplate that the commissioner shall, if in his judgment such is necessary in order to guard against possible abuse by the nonbeverage alcohol industry, and allied industries, decide not merely what quantities of alcohol shall be released for nonbeverage purposes and in what form, but also to what *types* of individuals or corporations, it shall be released, that is, whether directly to the manufacturer, or to the wholesale jobber or distributor. Again, this does not mean that the commissioner may say to A that he cannot have nonbeverage alcohol, and at the same time allow B to have it, if the demands of A and B are both bona fide, and their markets substantially identical, but the commissioner may, under certain circumstances, require that those who seek permits for denatured alcohol, for the purpose of manufacturing specific products, shall themselves do the manufacturing. In short, the commissioner may discontinue releasing denatured alcohol for such purposes to wholesale jobbers or distributors, and confine the release only to those who manufacture the article which is purported to be for ultimate consumption. If this be true, we may assume, without deciding, in the present case, that there was no bad faith at any time on the part of the complainant, and we may further assume that the most recent action of the local administrator, which is the basis of the present complaint, represents a complete change of policy, in direct conflict with what his superior had previously directed him to do, and still find complete justification for such action, provided, only, there is no evidence of arbitrary discrimination against the present complainant individually when his situation is compared with others under like circumstances. There is a total lack of any evidence in the record of such discrimination. Likewise, in spite of the strenuous argument of complainant's counsel to the contrary, the court finds the record devoid of any proof that the local administrator, the hearer, or any of his other deputies or agents were actuated by a spirit of reprisal or by any other improper motive. There is no evidence whatsoever that the local administrator, under any set of facts reasonably identical, has accorded to any other dealer of Dr. Quitt's type a similar permit. Indeed, Dr. Quitt's allowances of specially denatured alcohol under his successive per-

mits have gradually increased until, under his permit of last year, he was withdrawing a larger amount than that allowed to any other permittee in the state of Maryland.

Enough has already been said to show that there is no force in the argument that just because large quantities of denatured alcohol have been released in past years to Dr. Quitt, the government is estopped, in the absence of bad faith, from discontinuing such releases. In view of the broad powers reposing in the commissioner which have just been discussed, Dr. Quitt can have no such vested right, unless there arises some contractual relationship, expressed or implied, between him and the government. As proof that such did not exist, it is sufficient merely to point out that, although there was a conflict between the former local administrator and the commissioner as to the policy which should be pursued respecting Dr. Quitt's permits, the record is replete with uncontradicted testimony that both the commissioner's office in Washington as well as the local administrator's office in Baltimore, were subjecting Dr. Quitt's operations to the closest scrutiny, and that elaborate and lengthy investigations were repeatedly made, at the instance of both, regarding the possible diversion of his products.

Under all of these circumstances, therefore, the court has no right to attempt to interfere with the conclusions of the local administrator. Again, it is repeated that it is not necessary for him to prove that any of complainant's products have been, or are now being diverted to beverage uses. It is sufficient, if, on the entire record, it appears that the local administrator has reasonable ground to believe that the nonrenewal of a permit of the present kind, under the circumstances now existing, is necessary in order to insure against improper diversion. The very fact that such diversion is inherently so difficult of detection, is the basis for the necessity of giving such broad powers to the local administrator. A single example taken from the record showing the status of one of complainant's customers, the Standard Drug & Sales Company, of Philadelphia, and the character of its dealings with complainant, will be sufficient to show the reasonableness of the government's position. In 1927, the final increase of 5,000 gallons monthly allowed to Dr. Quitt was granted primarily to fill an order of the above named customer, so that it might use the alcohol in one of its liniment products known as "Muscletone." However, this concern was not then, nor is it now,

a permittee, nor does it any longer manufacture "Muscletone" itself, but employs another concern holding a government permit to manufacture the product with a different formula of camphor and iodine, which has been found much cheaper. The head of the Standard Drug & Sales Company gave as the reason for his company's not seeking a government permit and not manufacturing its own products, that such permit would result in great annoyance due to the red tape involved, and that his company found it more profitable to devote its energies to selling its products. When asked why it was necessary for his company to purchase any product like Dr. Quitt's instead of letting the manufacturer buy it direct, he replied that "what we purchase from Dr. Quitt now is for 'Fumo' and 'Shampoo.' That manufacturer [the present manufacturer of 'Muscletone'] is not equipped, nor does he have this formula. Dr. Quitt is." He added that the manufacturer in question is one of the largest permittees in the country, doing a business of "probably $10,000,000 a year." In the face of such evidence, it cannot be said that the local administrator has been unreasonable in declaring that there is no legitimate trade necessity for allowing Dr. Quitt, or any other similar jobber, to act as a distributor of denatured alcohol as a basic material for ultimate products such as those here involved, the manufacture of which can obviously be more cheaply and more efficiently performed if the manufacturer itself directly receives its supply of basic material.

In view of what has been said, there is no necessity for considering the conflicting testimony as to whether a potable alcohol is obtainable from the complainant's product by simple distillation or manipulation. It is sufficient to point out that complete justification for what the local administrator has done is to be found in the language of section 4, title 2, of the National Prohibition Act (27 USCA § 13), which states that "A person who manufactures any of the articles mentioned in this section [which includes toilet preparations] may purchase and possess liquor for that purpose, but he shall secure permits to manufacture such articles and to purchase such liquor, give the bonds, keep the records, and make the reports specified in this chapter and as directed by the commissioner." That is to say, the act contemplates, under a proper interpretation of it, that the person to whom the liquor, that is, the denatured alcohol, is released, shall himself manufacture the product of which the denatured

alcohol is an ingredient,—certainly if he does not himself manufacture it, or if, as here, although he does manufacture it, such is done with no intent that the ultimate consumer shall use the product as such, but that it shall merely form an ingredient for a different preparation both manufactured and sold by others, that then justification for such methods shall, from a trade standpoint, be unequivocally proven.

It must be borne in mind that the functions of the Bureau of Prohibition in administering the permissive system with respect to industrial alcohol under the National Prohibition Act, are of equal, if not more, importance than the bureau's functions in relation to the administration of what may be termed the strictly enforcement provisions of the act. The perfumery and toilet water trade is a large and legitimate one, and requires the application of specialized formulas involving the addition of an odorless, basic perfume material known chemically as "diethylpthalate," to alcohol, but just as a policy for properly controlling the manufacture of alcohol must limit such manufacture to normal, legitimate needs, so must the policy be limited with respect to that other class of permittees who are not concerned with primary production, but whose supervision and regulation is equally important if diversion of specially denatured alcohol for beverage purposes is to be prevented. The Bureau of Prohibition has power to limit, and does limit, the quantity of industrial alcohol in the country as a whole. Requests for permission to manufacture increased quantities have frequently been denied, and such denial upheld by the courts, where the evidence presented was not sufficient to show that an increase was necessary to take care of the legitimate demand. Some alcohol producers have even been forced to close down before the end of a given year, although they had contracts to deliver more alcohol than they had produced; and in order to fill their commitments, they purchased alcohol from other permittees who had not disposed of all the alcohol they were permitted to manufacture under their allotment. If, then, such policy of control of primary production is permissible under the National Prohibition Act, the court sees no reason to say that an equally strict policy may not be adopted with respect to that other class of permittees with whom we are here concerned, if, in the discretion of the commissioner, or his deputies, the same appears to be reasonably desirable, especially in view of the restrictions, inherent in the law, involved in the tracing of any manufactured product beyond the original purchaser.

Since, therefore, as we have seen, the discretion impliedly if not expressly vested in the commissioner, and his deputies, by the National Prohibition Act, the dominant purpose of which is to prevent the use of intoxicating liquor as a beverage, is not restricted to a consideration of the applicant's fitness to be intrusted with a permit, and his good faith in making application therefor, we are not called upon to weigh the evidence in this respect, and since we find that the testimony as a whole amply justified the local administrator in deciding the permit operations as conducted by complainant are not in conformity with the law and the regulations validly promulgated thereunder, in that complainant is neither manufacturing nor intends to manufacture any toilet preparation marketable as such, the action of the local administrator must be affirmed, and the bill of complaint accordingly dismissed.

There is one other question which remains to be decided, and that is, whether the local administrator was warranted in forbidding the complainant, as a corollary to the denial of his permit, to dispose of any part of his product which he might have on hand to any but permittees.

The court considers such action a reasonable and proper supplement to the primary decision of the local administrator, and not in violation of what the court intended should be done when it extended complainant's permit until the local administrator might make his findings. Such action is in no sense confiscatory. The designated market exists, and the restriction is reasonably necessary if full force and effect is to be given to the local administrator's primary action hereby affirmed. See W. H. Long & Co. v. Campbell (D. C.) 36 F.(2d) 496.